Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JACQUELYN PEDIGO, on Behalf )
of Herself and Others        )
Similarly Situated           )
      Plaintiff,            )
                    )
vs.                          )     NO.1:08-cv-803JRN
                    )
3003 SOUTH LAMAR, LLP d/b/a )
ALLIGATOR GRILL              )
      Defendant.            )

ORAL AND VIDEOTAPED DEPOSITION

PAUL BLANDFORD

September 18, 2009


    ORAL AND VIDEOTAPED DEPOSITION OF PAUL BLANDFORD,

produced as a witness at the instance of the Plaintiff

and duly sworn, was taken in the above-styled and

numbered cause on the 18th day of September, 2009, from

11:06 a.m. to 1:08 p.m., before LAUREN M. MORRISON      ,

Certified Shorthand Reporter in and for the State of

Texas, reported by computerized stenotype machine at the

offices of Stephen M. Orr, 804 Rio Grande Street,

Austin, Texas 78701, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

**EXHIBIT**
**8**
tabbies

Page 2

```
 1                    APPEARANCES
 2
 3    FOR THE PLAINTIFF:
 4       Mr. Robert R. Debes, Jr.
         DEBES LAW FIRM
 5       17 S. Briar Hollow Lane
         Suite 302
 6       Houston, Texas 77027
         Telephone: (713) 623-0900
 7       Fax: (713) 623-0951
 8    FOR THE DEFENDANT:
 9       Mr. David W. Crawford
         ORR & OLAVSON
10       804 Rio Grande Street
         Austin, Texas 78701
11       Telephone: (512) 472-8392
         Fax: (512) 473-8417
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          THE VIDEOGRAPHER:  This is the video taped
 2    deposition of Paul Blandford taken in the matter of
 3    Jacquelyn Pedigo on Behalf of Herself and Others
 4    Similarly Situated, Plaintiff, verses 3003 South Lamar,
 5    LLP d/b/a Alligator Grill, Defendant; Civil Action
 6    number 1:08-cv-803JRN in the United States District
 7    Court, Western District of Texas, Austin Division.
 8          This deposition is being held in the
 9    offices of Stephen Orr, 804 Rio Grande Street, Austin,
10    Texas 78701.  The date is September 18, 2009.  We're on
11    the record at 11:06.
12          Will the attorneys please introduce
13    themselves for the record.
14          MR. DEBES:  This is Bob Debes for the
15    plaintiffs.
16          MR. CRAWFORD:  David Crawford for the
17    defendant.
18              PAUL BLANDFORD,
19    having been first duly sworn, testified as follows:
20              EXAMINATION
21    BY MR. DEBES:
22    Q   Tell us your name, please, sir.
23    A   Paul Blandford.
24    Q   Mr. Blandford, put your role in perspective for
25    this jury.  You are currently the assistant — I'm
```

Page 3

```
 1
 2                    INDEX
 3                              PAGE
 4    PAUL BLANDFORD
 5    Examination by MR. DEBES ..........................4
      Changes & Corrections ......................... 97
 6    Signature Page ................................. 98
      Court Reporter's Certificate .................... 99
 7
 8          REQUESTED ON THE RECORD
 9                              PAGE
10    No. 1 Current dish person's first and last name   67
11    No. 2 Prep cook's first and last name            72
12
13              EXHIBITS
14
15    EXHIBIT       DESCRIPTION        PAGE
16    8        Jacquelyn Pedigo's employee      49
               clock out sheets
17
      9        Copy of Javier Canchola's        95
18             tipshare check
19    10       Tip Distribution Report          78
20
21
22
23
24
25
```

Page 5

```
 1    sorry.  You're currently the general manager for the
 2    Alligator Grill here in Austin.  Is that right?
 3    A   That's correct.
 4    Q   How long have you held that position?
 5    A   Four years.
 6    Q   Okay.  So we are currently in September of
 7    2009, so you've held that position since sometime in,
 8    roughly, 2005?
 9    A   Correct.
10    Q   Okay.  Have you reviewed anything before
11    giving — or before coming to your deposition today?
12    A   No.
13    Q   You've not reviewed any materials to prepare
14    you for your deposition today?
15    A   No.
16    Q   Have you read the deposition or reviewed the
17    deposition of Steven Wimberly?
18    A   No, I have not.
19    Q   Have you reviewed the deposition of David
20    Gebser?
21    A   No, I have not.
22    Q   Okay.  Have you reviewed any of the policies
23    and procedure manuals from the Alligator Grill?
24    A   I helped write them.
25    Q   Okay.  But have you reviewed them in
```

Page 34

1    Right?
2      A   Yes.
3      Q   To refill, perhaps, the bar — the beer and the
4    liquor bottles, that type of thing. Is that correct?
5      A   Yes, sir.
6      Q   Okay. Is that the primary responsibility of
7    the bar-back?
8      A   Yes, it is.
9      Q   Okay. In other words, the bar-back spends the
10   majority of his — I guess all of them are him.
11     A   Yes, sir.
12     Q   I apologize. All of — let me start over.
13        The bar-backs spend the majority of their
14   time, at the Alligator Grill doing the types of things
15   that we just discussed. Is that fair?
16     A   That's fair.
17     Q   Okay. Now, on page 3 of Exhibit No. 4, you'll
18   see at the top it says, job description.
19     A   Yes, sir.
20     Q   And it says title, Team Member?
21     A   Yes, sir.
22     Q   Who are the team members?
23     A   That's anybody that works at the Alligator
24   Grill.
25     Q   Okay. Does this include the dishwashers?

Page 35

1      A   Yes, sir.
2      Q   Are the expediters considered team members
3    also?
4      A   Yes, sir.
5      Q   Are cooks considered team members?
6      A   Yes, sir.
7      Q   Are members of management considered team
8    members?
9      A   Yes, sir.
10     Q   Okay. The servers are obviously considered?
11     A   Yes, sir.
12     Q   And hostesses?
13     A   Yes, sir.
14     Q   Okay. Under the uniform requirements on this
15   same page, page 3 of Exhibit No. 4, there are uniform
16   requirements for the server. Correct?
17     A   Correct.
18     Q   And the third one down — or actually, the
19   third bullet point down says Alligator tee shirt and
20   black, forward slash, dark green apron?
21     A   Correct.
22     Q   The wait staff don't [sic] wear aprons; do
23   they?
24     A   Yes, sir, they do.
25     Q   They do. And they wear Alligator Grill tee

Page 36

1    shirts?
2      A   Yes, sir.
3      Q   It's my understanding that both, the males and
4    the females, at one point in time wore Alligator Grill
5    tee shirts. And then at some point in time, the female
6    waiters — waitresses have started wearing tank tops
7    with the Alligator Grill logo.
8      A   Yes, sir.
9      Q   Is that right?
10     A   Yes.
11     Q   Okay. And similarly, the bartenders. The
12   bartenders wear either an Alligator Grill tee shirt or
13   tank top, or a black shirt. Is that right?
14     A   Yes, sir.
15     Q   Or a dark shirt?
16     A   Yes —
17     Q   Black?
18     A   Yes.
19     Q   Okay. And on Exhibit No. 4, page 3, underneath
20   the uniform requirement, it says that the employees will
21   purchase shirts at cost. You see that?
22     A   Yes, sir.
23     Q   And it's been the policy of the Alligator Grill
24   to require its employees to purchase the uniforms from
25   the restaurant. Is that true?

Page 37

1      A   In the past, yes, sir.
2      Q   Okay. In fact, if you turn to page 12 of
3    Exhibit No. 4, you'll see that the bottom — it says
4    shirts are currently $7.50 for employees, aprons are
5    also $7.50. Correct?
6      A   Correct.
7      Q   So historically, the restaurant has charged the
8    servers $7.50 for their tee shirts and/or aprons.
9    Correct?
10     A   In the past, yes.
11     Q   Okay.
12     A   We no longer do that.
13     Q   All right. And — and y'all no longer do that
14   today. True?
15     A   Correct.
16     Q   When did y'all stop doing that?
17     A   It was this year. I'm not sure of the exact
18   date.
19     Q   It was after this lawsuit was filed. Correct?
20     A   I believe so, yes.
21     Q   This lawsuit was filed in October of 2008.
22     A   Okay.
23     Q   And the Department of Labor came in and did an
24   audit of the restaurant. You recall that?
25     A   Yes, I do.

Page 46

1    Q   Okay. And we're going to get to that in a
2   minute. But at the restaurant, are the only two
3   positions that receive gratuities directly from the
4   staff — from the customers, the waiters and the
5   bartenders?
6    A   That's correct.
7    Q   Okay. And at the end of every shift, the
8   waiter is required to contribute 4 percent of their
9   net — total net sales to a tip pool. Is that fair?
10   A   That's correct.
11   Q   And that's reflected on page 5 of Exhibit No. 4
12  also. Correct?
13   A   Yes, sir.
14   Q   Is that the tipout policy at the restaurant?
15   A   Yes, sir.
16   Q   How long has that been the policy?
17   A   I believe pretty much since we started. If
18  not, it was within a month of when we started.
19   Q   Okay. And I believe Mr. Wimberly told me that
20  he purchased the restaurant in, I think, May of 2004.
21  Does that sound generally correct?
22   A   I wouldn't know. I didn't start until August
23  of '05.
24   Q   Okay. When you came on in August of '05, or
25  shortly thereafter, the tip pool was in effect, or

Page 47

1   assumed thereafter became 4 percent of total net sales?
2    A   There was a tip pool in effect before we
3   started.
4    Q   Okay. But the 4 percent of total net sales has
5   been the Alligator Grill's tip pool policy for the last
6   several years. Right?
7    A   Correct.
8    Q   And this is a mandatory policy. Correct?
9    A   Yes, sir.
10   Q   In other words, the bartenders and waiters are
11  required, by policy, to contribute 4 percent of their
12  total net sales every shift to the tip pool. True?
13   A   Correct.
14   Q   Okay. And this applies to all of the waiters
15  and bartenders at the restaurant. Correct?
16   A   Correct.
17   Q   In other words, there is not — there aren't
18  exceptions to this policy. True?
19   A   The only exception that I can think of is in
20  the past, when there were no staff to help out, we moved
21  it — changed the hours so that the bartenders would
22  make more at the end of the shift if there was nobody to
23  help them.
24   Q   Okay. Have you ever had a — an employee, a
25  waiter or bartender, refuse to participate in the tip

Page 48

1   pool? In other words, refuse to contribute 4 percent of
2   their sales to the other people?
3    A   No.
4    Q   Has the tip pool always been 4 percent? Has it
5   been a higher or lower percentage over the years?
6    A   I believe it's always been 4 percent as long as
7   we've been there.
8    Q   Okay. Let's talk about the procedure — or the
9   mechanics I should call it, of the tipout. Okay?
10   A   Okay.
11       (Exhibit 8 marked)
12   Q   I'm going to hand you what's been marked as
13  Blandford Exhibit No. 8. And the reason I'm starting
14  with No. 8 is because Exhibits No. 1 through 6 were
15  marked to Mr. Wimberly's deposition, and Exhibit No. 7
16  was marked in Mr. Gebser's deposition.
17       Mr. Blandford, you've got Exhibit 8 in
18  front of you. Are you familiar, generally, with what
19  this document represents?
20   A   Yes, I am.
21   Q   Okay. You'll see in the lower right-hand
22  corner there is what I'll refer to as a bates stamp.
23  It's a number that's designated, P0002. Do you see
24  that?
25   A   Yes, sir.

Page 49

1    Q   Okay. That's a bates label that I put on
2   there. I just want you to know this was not on the
3   original document. Okay?
4    A   Okay.
5    Q   Looking at Exhibit No. 8, this appears to be
6   three separate checkouts — or clock outs for Jacquelyn
7   Pedigo. True?
8    A   True.
9    Q   And this is a document or a report that would
10  have been created at the end of her shift on each of
11  those respective evenings. True?
12   A   Yes. It's her clock out slip.
13   Q   Okay. If you look at the — there are three
14  receipts. The first one on the left — upper left is
15  August 4th of 2008. The one to the right is July 30th
16  of 2008. And the one at the — in the middle is
17  August 11th of 2008. Correct?
18   A   Correct.
19   Q   And you were the general manager for the
20  restaurant during all three of those shifts. Is that
21  true?
22   A   Well, I don't know if I was there that day, but
23  myself and Robb were the GMs at that point, yes.
24   Q   Okay. Looking at — let's start with the one
25  on the upper-left, the August 4th.